Michael L. Banks, Esquire (*pro hac vice to be filed*)
Sarah E. Bouchard, Esquire
David A. Gomez, Esquire
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5387
mbanks@morganlewis.com
sbouchard@morganlewis.com
dgomez@morganlewis.com

Sean P. Lynch, Esquire
502 Carnegie Center
Princeton, NJ 08540
609-919-6611
slynch@morganlewis.com

*Counsel for Plaintiff*
*IMS HEALTH INFORMATION SOLUTIONS USA LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMS HEALTH INFORMATION SOLUTIONS USA LLC (f.k.a. Cegedim Strategic Data USA LLC), <br><br> Plaintiff, <br><br> v. <br><br> BRUNO LEMPERNESSE, <br><br> Defendant. | Civil Action No. _____ |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

IMS Health Information Solutions USA LLC ("IMS HIS" or "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Defendant Bruno Lempernesse ("Lempernesse") seeking injunctive relief and monetary damages.

## PRELIMINARY STATEMENT

1.     IMS HIS initiates this action to prevent Lempernesse, a former high-ranking employee of IMS HIS in wrongful possession of information pertaining to the Company's most valuable data processes, models, analytics, and relationships, from causing it irreparable harm by using these misappropriated trade secrets to the benefit of a newly created business that directly competes with IMS HIS.

2.     Lempernesse intentionally accessed, copied, and still possesses thousands of key documents on multiple devices containing highly sensitive and confidential trade secrets belonging to IMS HIS.

3.     The evidence of Lempernesse's misappropriation is overwhelming, and inescapably done to benefit a business that directly competes with IMS HIS.

4.     The harm that Lempernesse will inevitably cause and continue to cause to IMS HIS if undeterred cannot be quantified or repaired after the fact,

and the status quo should be maintained while the parties have the opportunity to conduct expedited discovery, as well as a forensic examination of all missing electronic devices.

5.     The Company thus brings this action to enjoin Lempernesse from competing with IMS HIS in any capacity until (1) the missing electronic devices are produced and forensically reviewed, (2) IMS HIS has the opportunity to take expedited discovery; and (3) a hearing on IMS HIS's preliminary injunction motion takes place and a ruling is issued by this Court.

## THE PARTIES

6.     IMS HIS is a Delaware corporation with its principal place of business at 10 Exchange Place, Jersey City, NJ 07302.

7.     Lempernesse is an individual and a citizen of France, residing at 7701 Barnum Road, Bethesda, MD 20817.  He most recently worked at IMS HIS as its Chief Operating Officer pursuant to an expatriation contract.  Effective on September 1, 2015, Lempernesse's relationship with IMS HIS ceased.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction over this action pursuant to the diversity of citizenship provisions contained in 28 U.S.C. § 1332, because the matter in controversy, including the value of the injunctive relief sought, exceeds

the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

9.     This Court also has personal jurisdiction over the Lempernese because, as described further below, Lempernesse worked at IMS HIS's principal place of business in New Jersey, and had substantial contacts with this state.

10.     Venue is proper in the District Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in the Complaint took place in this district.

## FACTUAL ALLEGATIONS

**A.     IMS HIS's Background and Company Information**

11.     IMS HIS is a wholly-owned subsidiary of IMS Health Incorporated ("IMS Health").  IMS Health is a leading information, services, and technology company dedicated to improving healthcare platforms.  IMS Health and its subsidiaries, such as IMS HIS, help customers improve patient outcomes and operate more efficiently by providing clients with real-world evidence, advanced analytics, and proprietary software platforms.  IMS Health's customers include, but are not limited to, pharmaceutical, medical device and consumer health manufacturers and distributors, providers, payers, government agencies, policymakers, researchers, and the financial community.  IMS Health partners with its customers to provide evidentiary-based data to help generate improved

customer outcomes.  IMS Health markets its products throughout the United States and internationally.

12.     On April 1, 2015, IMS Health acquired Cegedim, SA's ("Cegedim") customer relationship management and strategic data business units to expand the range of its offerings for information and technology services and provide faster and more impactful insights to its customers.  Cegedim is a French company that provides information and technology services to the healthcare sector.  Through the acquisition, IMS Health assumed control over Cegedim Strategic Data USA LLC ("CSD USA"), which became IMS HIS and Cegedim Strategic Data France, SA ("CSD France"), which, in turn, became IMS Health Information Solutions France, SA ("IMS HIS France").

**B.    Lempernesse's Employment History and His Unfettered Access to the Company's Trade Secrets**

13.     Lempernesse began working for CSD France in January 2006. Then on or about September 1, 2011, Lempernesse accepted a position as Chief Operating Officer for CSD USA, which required him to work in Jersey City, New Jersey.  Accordingly, Lempernesse entered into an expatriation contract for this position, which was initially set to expire on July 31, 2012, but was eventually extended to August 31, 2015.

14.     As the Chief Operating Officer for CSD USA, Lempernesse built Cegedim's strategic data business in North America.  Lempernesse hired a

team of employees, developed strategic contracts, set-up data panels, and oversaw the business's operations in the United States and Canada.  In this role, Lempernesse reported directly to the CEO of Cegedim's Strategic Data business, Bruno Sarfati, who in turn reported directly to the CEO of Cegedim, Jean-Claude Labrune.   In his capacity as the Chief Operating Officer, Lempernesse had unfettered access to the Company's strategic plans, confidential pricing formulas, sales figures, customer lists, and proprietary data collection/analysis methods, all of which concern the core of the Company's business.

15.     Indeed, as the architect of Cegedim's Strategic Data business in North America, Lempernesse had access to several types of trade secrets and information.  For instance, Lempernesse regularly engaged in strategic planning across various markets and platforms to assess customers' future needs and best position the Company to meet those needs in the United States and Canada.

16.     Similarly, as the Chief Operating Officer for CSD USA, Lempernesse was privy to such high-level business strategies on a global basis as well.  These strategic plans also included promotional marketing and pricing strategies.  In particular, Lempernesse was responsible for directing the promotion of IMS HIS's products and services, and he was privy to highly confidential information regarding promotional pricing received from data suppliers and offered to customers.  IMS HIS's strategic planning and pricing information is not

known publicly or even within the Company outside of the employees in executive positions such as Lempernesse.

17.     Furthermore, Lempernesse had access to the Company's proprietary analytics and technology behind its Longitudinal Patient Databases ("LPDs") and promotional offerings, which are core products marketed by the Company.  LPDs in particular allow customers to analyze and track the implementation and performance of various disease management strategies (e.g., medication, therapies) in various market places and segments.  For LPDs, patient and prescription information are collected through a constant panel of over 8,000 office-based Primary and Secondary care physicians, and over 11 million patients are continuously tracked.

18.     The Company's promotional offerings track similar data to allow customers to analyze the effectiveness of their current marketing efforts and/or develop new marketing strategies.  In that regard, Lempernesse also had access to key data supplier information and contracts terms, both of which are highly confidential.  The technology and know-how necessary to set up these LPDs and promotional offerings are sensitive trade secrets, all of which Lempernesse had access to up until his last day of employment with the Company.

19.     Lempernesse's access to trade secrets also extended beyond that of CSD USA and IMS HIS, and included routine access to trade secrets belonging

to IMS Health, the parent company of IMS HIS.  Given Lempernesse's executive employee status and the Company's post-acquisition integration efforts, Lempernesse's access included IMS Health's business strategies, sales figures, pricing guides, customer and data supplier contract terms, and proprietary database analytics.  Ultimately, very few employees within the IMS Health corporate family enjoyed or were entrusted with the type of unfettered access to trade secrets given to Lempernesse.

**C.      IMS HIS Protects Its Trade Secrets and Confidential Information**

20.      IMS HIS recognizes the tremendous value of its trade secrets and confidential information and takes steps to protect access to such information. IMS HIS has in place policies, including a business conduct policy, that require employees to keep its business information confidential and prohibit employees from using its information for any purpose other than the benefit of IMS HIS. These policies are available on the Company intranet to which all IMS HIS employees have access.

21.      Moreover, the Company requires executive-level employees such as Lempernesse to acknowledge their confidentiality obligations through confidentiality agreements.

22.     Consistent with this requirement, on June 3, 2014, Lempernesse executed a "Loyalty, discretion, and confidentiality" addendum to his original employment contract with CSD France.  This addendum states in part:

> One of the main activities of the Group CEGEDIM, to which the company CEGEDIM Strategic Data USA LLC belongs, is the production and marketing of databases. CEGEDIM has spent, since its creation, heavy investments in this respect which has resulted in a strong economic and strategic value attached to these databases. The employee acknowledges that the disclosure to third parties of any information related to the content of these databases and relating to the procedures of production and functioning would cause harm to the Group CEGEDIM, which would be entitled to claim a compensation to the employee.

23.     Moreover, as a CSD France employee, Lempernesse was well aware of the value of maintaining confidentiality of information and data. Lempernesse was subject to the Cegedim Ethics Charter.  Among other provisions, the Charter requires employees to "Protect confidentiality of information and access to data according to their missions and responsibilities" and to "Protect information and privileged data which an employee may access because of his/her professional activity, using them only as part of his/her functions, and respecting the obligation of confidentiality towards third parties."

24.     Thus, Lempernesse personally acknowledged the value of the trade secrets he had access to during his employment with CSD France and subsequently IMS HIS.

25.     Aside from requiring its employees to execute confidentiality agreements such as the aforementioned addendum, IMS HIS also physically restricts access to its facilities both for third-parties and for its employees.  IMS HIS facilities are not generally open to the public, including contractors, but controlled through a card-swipe system and/or by a receptionist.

26.     Third parties are only allowed access to the sections of the IMS HIS facility related to their legitimate business.  In addition, unlike Lempernesse, a vast majority of IMS HIS employees also do not have unfettered access to all IMS HIS facilities but are restricted generally to the facility in which they work, absent a legitimate business reason for broader access.  IMS HIS also restricts access to its online systems and information technology to Company employees on an as-needed basis.

**D.     Lempernesse's Employment Dispute with IMS HIS France**

27.     After the acquisition of CSD France and CSD USA, Lempernesse was informed that there would be a ninety-day evaluation period, in which there would be no changes to the management structure.  During this period, Lempernesse continued to have unfettered access to the Company's strategic plans, confidential pricing formulas, sales figures, customer lists, and proprietary data collection/analysis methods.

28.     Unwilling to wait and see what happened after the evaluation period, on May 11, 2015, Lempernesse sought to rely upon the "Change of Control" provisions of his expatriation agreement and notified IMS HIS France that he believed that his duties and responsibilities had been materially diminished as a result of the acquisition.

29.     In particular, Lempernesse purportedly took issue with the change in the management reporting structure because his direct reports would soon be reporting to IMS Health's Global General Manager, and because he no longer reported directly to the CEO.  According to Lempernesse, he considered these to be both material and unauthorized changes to his employment and the corresponding expatriation contract, and demanded that IMS HIS France remedy the situation.

30.     IMS HIS France, both in consideration of Lempernesse's concerns and in recognition of his importance to the Company, offered Lempernesse the position of Vice President of Real World Evidence Solutions ("RWES") during a meeting on June 8, 2015.  This position gave Lempernesse global responsibilities, similar to or even more than the type of responsibilities Lempernesse had prior to the acquisition, and he would have reported directly to the global head of RWES.  Nevertheless, Lempernesse refused the offer, and, as

described below, on that same day began to misappropriate Plaintiff's most sensitive trade secrets.

31.     After Lempernesse refused the new role, IMS HIS France informed Lempernesse on August 12, 2015 that his employment would terminate on August 31, 2015, which represented the conclusion of the expatriation contract. Lempernesse exited the Company on September 1, 2015.

32.     Ultimately, Lempernesse and IMS HIS France settled the claims relating to his dispute over the change in control and executed a settlement agreement on September 11, 2015 (the "Settlement Agreement").

**E.     Lempernesse's Unlawful Conduct Preceding His Separation from IMS HIS**

33.     Following the expiration of Lempernesse's employment, the Company retained a forensic expert to examine Lempernesse's work computer.

34.     The examination revealed highly unusual activity on at least two key dates of his employment.  First, on June 8, 2015, the day Lempernesse rejected IMS HIS France's re-employment offer, he inserted two USB storage devices into his work laptop and accessed over 1,400 documents and files from those devices.  A vast majority of those documents and files contained highly confidential trade secrets belonging to IMS HIS.

35.     Examples of the type documents Lempernesse accessed from his USB devices, include:

a.      Documents containing highly confidential pricing grids and strategies relating to the Company's LPDs and promotional offerings.  Lempernesse could use this information to offer competing products and services at better prices than IMS HIS.

b.      Documents containing highly confidential information on key customers such as analysis on the strength of the customer relationship, opportunities for growth with the customer, and summaries of the products and prices offered to the customer. Lempernesse could use this information to gain insight into IMS HIS's key customer relationships, which he could exploit to gain business for his new company.

c.      Copies of Master Service Agreements ("MSAs") with various customers, containing the highly confidential terms of IMS HIS's agreements with those customers such as pricing terms.  These documents are the result of hours of negotiations and legal costs.  If competitors such as Lempernesse had such MSAs, they could potentially use it to offer better terms to IMS HIS's customers and save the expense of preparing an agreement "from scratch."

d.      Documents containing highly confidential and proprietary information on IMS HIS's database analytics and composition methodologies that goes to the core of the Company's business.  This includes documents concerning the Company's MSA terms with data suppliers, as well as strategic information on the status of those contracts.  These documents could provide Lempernesse with a blueprint to replicate the Company's LPDs.  Furthermore, Lempernesse could also use the information contained in the MSAs with data suppliers to procure exclusive agreements with those suppliers, which would substantially impact IMS HIS's access to data.

36.      Furthermore, Lempernesse took documents that contain

information outside of his core scope of responsibilities.  Specifically,

Lempernesse took documents containing trade secrets belonging to IMS Health,

the parent company of IMS HIS.

37.     Thus, Lempernesse is clearly looking to build a competitive enterprise, and apparently feels no compunction in taking anything – and everything – he feels would be competitively useful to him.

38.     On September 1, 2015 at 8:52 AM, the last day of his employment and mere hours before he was required to return all of the Company's documents, files, and devices, Lempernesse inserted a USB storage device into his work computer and proceeded to access hundreds of key documents containing highly confidential IMS HIS trade secrets on the computer.

39.     Although Lempernesse ultimately deleted these documents from the computer, the act of deleting these documents is, in itself, suspicious. There was no reason to delete work-related documents, as opposed to documents of a personal nature.  Rather, he *should* have retained them so that IMS HIS could access them after his laptop was returned.

40.     There can be no legitimate explanation for Lempernesse's suspicious conduct on the last day of his employment – i.e., inserting the USB drive to copy documents and then permanently deleting the documents from his work computer.  Rather, it can reasonably be concluded that Lempernesse engaged in those actions to conceal his wrongdoing and make it difficult for IMS HIS to trace how he copied those documents.

41.     Examples of some of the documents Lempernesse deleted and, upon information and belief, copied onto a USB drive, include:

a.     Documents containing highly confidential information on the Company's financial performance and data in various markets, which a competitor could use to target markets where IMS HIS has a developing presence;

b.     Documents containing highly confidential sales information, which a competitor could use to poach the Company's top sales employees and also target areas where the Company's sales could improve;

c.     Documents referencing highly sensitive research and development related to improve the Company's (and its parent IMS Health's) databases and core products; and

d.      Documents concerning the Company's promotional pricing grids and MSAs with data suppliers and customers.

42.     Lempernesse's internet history report on September 1, 2015, further demonstrates his intent to misappropriate the Company's trade secrets.  On that date the report indicates that between 7:59 to 8:19 AM, approximately 50 minutes before inserting the USB storage device, Lempernesse accessed several confidential documents from the IMS HIS network on his work computer.

43.     Thus, all of the forensic evidence strongly demonstrates that on the morning of his last day with the Company, Lempernesse looked through the documents he wanted to take from his work computer, inserted a USB storage device to copy over those files, and then deleted those files to remove any trace of his misappropriation.

44.     Lempernesse also had a laptop computer and cell phone that he used for business and personal activity.  The laptop computer was purchased by the Company for Lempernesse's personal and business use, and Lempernesse used his cell phone for IMS HIS business purposes.

45.     On October 7, 2015, upon discovering the extent of Lempernesse's unlawful conduct, IMS HIS's legal counsel sent a letter to Lempernesse, demanding that he return all of IMS HIS's proprietary and confidential documents or information immediately, and that the Company would pursue legal action if he did not do so.  Lempernesse's counsel responded on October 9, 2015, and made general allegations that there was a breach of the Settlement Agreement previously reached with his French employer.  Notably, his attorney did not deny that Lempernesse may possess IMS HIS trade secrets.[1]

46.     On October 12, 2015, IMS HIS responded to Lempernesse counsel's correspondence to reiterate its demand that Lempernesse return all files

---

[1] Lempernesse also responded by filing a lawsuit against IMS Health in the French courts, primarily claiming that the Company has violated the Settlement Agreement by threatening to bring legal claims against him.  Lempernesse has incorrectly claimed that the Settlement Agreement precludes IMS HIS's claim in this jurisdiction.  As an initial but dispositive matter, the Settlement Agreement was executed between IMS HIS France and Lempernesse.  And no clause or provision in the Settlement Agreement states that the waivers contained therein apply to non-parties.  Thus, contrary to Lempernesse's claim, IMS HIS has not waived any right to bring claims against Lempernesse in this jurisdiction or elsewhere, as the Company is not a party to the Settlement Agreement.  But even if a non-party such as IMS HIS were subject to the provisions of the Settlement Agreement, which it is not, the Agreement's forum-selection clause would still not apply to the current dispute.  IMS HIS is not bringing this action to dispute an interpretation of the Settlement Agreement or to enforce it.  On the contrary, IMS HIS initiated this action to prevent Lempernesse from using and/or disclosing the trade secrets he misappropriated, which occurred prior to the execution of the Settlement Agreement, but unbeknownst to IMS HIS.  Simply put, IMS HIS's claims are not related to or dependent on the Settlement Agreement.

and documents belong to the Company, and/or produce the electronic devices storing those files for forensic examination.

47.     Despite multiple requests, Lempernesse has not returned either the USB storage devices that he inserted on June 8th, or the USB device that he inserted on the last day of his employment.  Lempernesse also has refused to allow his laptop computer and cell phone to be forensically examined.

48.     Upon information and belief, Lempernesse currently possesses multiple USB storage devices and a laptop computer that contain over a thousand documents and files regarding some of IMS HIS's most sensitive trade secrets, and he is using or intends to use these trade secrets to benefit a new entity that directly competes with IMS HIS.

**F.     Lempernesse's Intent to Start a Business that Directly Competes with IMS HIS**

49.     Lempernesse's misappropriation is especially troublesome when viewed in conjunction with evidence demonstrating that Lempernesse intends to start a new business that directly competes with IMS HIS.

50.     Specifically, in May 2015, after IMS Health's acquisition of CSD France and CSD USA, Bruno Sarfati invoked the change-of-control clause in his employment contract and negotiated a buy-out to leave CSD France.  As mentioned above, Mr. Sarfati served as CEO of Cegedim's Strategic Data business at the time, and Lempernesse and Mr. Sarfati enjoyed a close working relationship.

51.     During Mr. Sarfati's buy-out negotiations, he expressed his intent to start a new entity.

52.     Notably, Mr. Sarfati's exit coincided with Lempernesse's expressed displeasure with IMS Health's acquisition of CSD France and CSD USA and his rejection of the global Vice President of RWES position offered by IMS HIS France.

53.     It was also right around the time Lempernesse inexplicably inserted two USB storage devices into his work computer to access over 1,400 key IMS HIS documents and files.

54.     Then on October 7, 2015, IMS HIS's Business Development Director and a direct report to Lempernesse, Igor Omelchenko, abruptly resigned.

55.     Laden among the files accessed by Lempernesse leading to his separation are those pertaining to Mr. Omelchenko and his business prospects and contacts.

56.     During his exit interview, Mr. Omelchenko refused to disclose his new employer, or what he intended to do after leaving IMS HIS, even though he is subject to a valid non-compete agreement and is obligated to provide such information.

57.     Finally, IMS HIS has learned through its industry contacts that Mr. Sarfati and Lempernesse have been seeking funding for a new business

purportedly called "Real Data Consulting."  Upon information and belief, this new company will directly compete with IMS HIS in the health information and data/analytics industry.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT, N.J.S.A. 56:15-1, *et seq.*

58.     Paragraphs 1 through 57 are incorporated by reference as if set forth fully therein.

59.     The documents and files copied by Lempernesse on the last day of his employment and/or contained in storage devices and his laptop computer that he did not return to IMS HIS, contain confidential and proprietary information that constitutes trade secrets belonging to IMS HIS.

60.     IMS HIS has expended substantial resources in developing its trade secrets for its exclusive benefit, and the information provides IMS HIS with an advantage over its competitors. IMS HIS's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

61.     IMS HIS does not disclose its trade secrets to its competitors and has taken all reasonable efforts to protect their confidentiality, by means including, but not limited to, having its employees sign confidentiality agreements and maintaining security procedures protecting its trade secrets.

62.     IMS HIS communicated its trade secrets to Lempernesse in confidence and Lempernesse knew that IMS HIS intended for its trade secrets to remain confidential.

63.     Lempernesse has misappropriated IMS HIS trade secrets by retaining them and/or removing them from the Company's premises without authorization.

64.     Upon information and belief, Lempernesee has used or intends to use IMS HIS's trade secrets to start a business that competes with the Company and/or to enable other persons or entities to better compete with the Company.

65.     Lempernesse's actions as set forth herein constitute willful and malicious misappropriation of IMS HIS's trade secrets.

66.     By reason of the acts alleged herein, IMS HIS has been significantly damaged, the precise amount to be determined at trial.

67.     By reason of the acts alleged herein, IMS HIS is also entitled to injunctive relief to compel the return of IMS HIS's trade secrets and confidential and proprietary information and to prevent further use and/or dissemination thereof and further harm to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, IMS HIS requests the following relief:

(a)     That Lempernesee be ordered preliminarily and permanently to return to IMS HIS all trade secrets and other confidential and proprietary information in his possession or control, including all USB storage devices he inserted into his IMS HIS work computer;

(b)     That Lempernesse be ordered to produce his laptop computer and cell phone for forensic examination;

(c)     That Lempernesee be preliminarily and permanently enjoined from using, transmitting, or disclosing any IMS HIS trade secrets and confidential and proprietary information;

(d)     That Lempernesee be ordered to disclose the names and addresses of any and all persons to whom he has disclosed IMS HIS's trade secrets and other confidential and proprietary information;

(e)     That Lempernesse be ordered to disclose for what purposes and projects he has used IMS HIS's trade secrets and confidential and proprietary information;

(f)     That Lempernesse submit to expedited discovery;

(g)     That IMS HIS be awarded compensatory damages, punitive damages, pre-judgment and post-judgment interest, attorneys' fees, and costs; and

(h)     That IMS HIS be awarded such other and further necessary and proper relief as the Court may deem just and proper.

| | |
|---|---|
| Dated:  October 19, 2015 | Respectfully submitted,<br><br>By:  *s/ Sarah E. Bouchard*<br>MORGAN, LEWIS & BOCKIUS LLP<br>Michael L. Banks, Esquire<br>(*pro hac vice to be filed*)<br>Sarah E. Bouchard, Esquire<br>David A. Gomez, Esquire<br>1701 Market Street<br>Philadelphia, PA 19103<br>215-963-5387<br>mbanks@morganlewis.com<br>sbouchard@morganlewis.com<br>dgomez@morganlewis.com<br><br>Sean P. Lynch, Esquire<br>502 Carnegie Center<br>Princeton, NJ 08540<br>609-919-6611<br>slynch@morganlewis.com<br><br>*Counsel for Plaintiff*<br>*IMS HEALTH INFORMATION*<br>*SOLUTIONS USA LLC* |

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, the undersigned counsel for Plaintiff IMS Health Information Solutions USA LLC certifies that, to the best of his knowledge, information, and belief, the matter in controversy is not the subject of any other action or proceeding.

<u>*s/ Sarah E. Bouchard*</u>
Sarah E. Bouchard

Dated: October 19, 2015

## **VERIFICATION**

I, Jon Resnick, pursuant to 28 U.S.C. § 1746, hereby state that I am the Vice President and General Manager, Real-World Evidence Solutions for IMS Health Incorporated; that I am authorized to make this verification on behalf of Plaintiff in the foregoing action; that I have personal knowledge of the statements made in the foregoing document; and I declare under penalty of perjury that the statements made in the foregoing document are true and correct to the best of my knowledge, information, and belief.

Dated this 19 day of October, 2015.

_____

Jon Resnick